# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

ALBERT A. CICCONE,

               Petitioner,

vs.

RANDY BLADES, et al.,

               Respondents.

Case No. 1:13-cv-00465-CWD

**MEMORANDUM DECISION AND ORDER**

     Pending before the Court is an Amended Petition for Writ of Habeas Corpus filed by Petitioner Albert A. Ciccone ("Petitioner" or "Ciccone"). (Dkt. 9.) The Amended Petition is now fully briefed and ripe for adjudication. (Dkts. 14, 20, 21.) The Court takes judicial notice of the record from Petitioner's state court proceedings that has been lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

     All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Dkt. 23.) Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying habeas corpus relief.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

## 1.     State Court Proceedings

"On October 16, 2003, Petitioner struck his pregnant wife with his car, killing her and the unborn fetus." (State's Lodging C-9 at 1.) In a criminal action in Elmore County, Idaho, Petitioner, a member of the United States Air Force, "was charged with two counts of first-degree murder—one count for his wife and one count for the unborn fetus." (*Id.*)

Following a continuance of approximately five and one half months from the original trial date, Petitioner's trial began on January 4, 2005. The jury found Petitioner guilty of the first-degree murder of his wife, and second-degree murder of her unborn fetus. The court imposed a fixed life sentence for the first-degree murder, and a fifteen-year fixed sentence for the second-degree murder. (*Id.*)

Petitioner's counsel filed a notice of appeal too late, and the direct appeal was dismissed. Petitioner's direct appeal rights were reinstated on initial post-conviction review. (State's Lodgings C-1 at 16-19; D-1 at 18-19.) Petitioner then pursued a direct appeal, raising three claims: (1) prosecutorial misconduct in closing argument; (2) a statutory and constitutional speedy trial violation; and (3) an excessive sentence under Idaho law. (State's Lodging C-2.) The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. (State's Lodgings C-9, C-12.)

Petitioner then filed a successive post-conviction action, asserting numerous claims of ineffective assistance of trial and direct appeal counsel. (State's Lodging D-1 at

17-29.) The successive post-conviction action was dismissed after an evidentiary hearing. (State's Lodging D-1 at 160-79.)

Petitioner raised one issue on appeal of the dismissal of the post-conviction action—that his trial counsel was ineffective in failing to present a psychological evaluation at sentencing. (State's Lodging E-1 at 2.) The Idaho Court of Appeals affirmed the conviction, and the Idaho Supreme Court denied review. (State's Lodgings E-4, E-7.)

## 2.    The Instant Federal Petition

Petitioner filed his initial federal petition in this case in October of 2013, and the case was stayed pending completion of Petitioner's successive post-conviction proceedings. (Dkt. 6.) Once those proceedings concluded, Petitioner filed his Amended Petition, and this case was reopened. (Dkt. 9, 10.)

Petitioner asserts the following claims in the Amended Petition. Claim A asserts that Petitioner's rights to a speedy trial—under (i) Idaho state law and (ii) the federal Constitution—were violated by the trial court's decision to continue the trial until January 2005. (Am. Pet., Dkt. 9, at 6-7.) Claim B assets that the prosecutor committed misconduct during closing argument by commenting on Petitioner's silence and by "asking the jury to convict . . . based on sympathy for the victim." (*Id*. at 7.) In Claim C, Petitioner contends that the trial court abused its discretion by imposing an excessive sentence. (*Id*. at 9-10.) Claim D alleges that the Idaho Supreme Court violated Petitioner's right to due process by requiring him to file his appellate brief before he

received all of the trial transcripts. (*Id*. at 10-11.) And in Claim E, Petitioner asserts that trial counsel was ineffective by failing to submit a psychological evaluation at sentencing. (*Id*. at 11-13.)

## STANDARD OF LAW

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas relief is further limited to instances where the state court's adjudication of the petitioner's claim

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In determining whether a petitioner is entitled to habeas relief, a federal court reviews the state court's "last reasoned decision." *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (emphasis omitted).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If there is any possibility that fair-minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. To be entitled to habeas relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling

on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

AEDPA deference is required even where the state court denied a petitioner's claim without expressly addressing it. In such a case, the federal court must "conduct an independent review of the record to determine what arguments or theories could have supported the state court's decision"; the court must then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a decision of the Supreme Court." *Bemore v. Chappell*, 788 F.3d 1151, 1161 (9th Cir. 2015) (internal quotation marks and alterations omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). This means that evidence not presented to the state court may not be introduced on federal habeas review

if a claim was adjudicated on the merits in state court and if the underlying factual determination of the state court was not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014).

Two separate statutory subsections govern a federal court's review of state court factual findings. When a petitioner contests the reasonableness of the state court's factual determinations based entirely on the state court record, a federal court must undertake a § 2254(d)(2) analysis. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). There are two general ways to challenge factual findings as unreasonable under § 2254(d)(2). "First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (internal citations omitted).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable . . . in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Under the second subsection dealing with state court factual findings, 28 U.S.C. § 2254(e)(1), such findings are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. In *Taylor v. Maddox*, the Ninth Circuit held that "the presumption of correctness and the clear-and-convincing standard of proof [as set forth in § (e)(1)] only come into play once the state court's fact-findings survive any intrinsic challenge [under § (d)(2)]; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." 366 F.3d at 1000.

However, in *Cullen v. Pinholster*, the United States Supreme Court held that new evidence introduced in federal court "has no bearing" on a merits review of a state court's legal conclusions; therefore, a petitioner cannot receive a federal evidentiary hearing on the merits of any claims that the state court has addressed unless the factual findings of the state court are unreasonable. 563 U.S. at 185. As the Ninth Circuit explained in *Murray v. Schriro*, the Court in *Pinholster* "eliminated the relevance of 'extrinsic' challenges when … reviewing state-court decisions under AEDPA." 745 F.3d at 999. Therefore, the relationship between § 2254(d)(2) and § 2254(e)(1) is not entirely clear. However, any differences between the two subsections are rarely, if ever, determinative. *See Wood*, 558 U.S. at 304-05 ("Because the resolution of this case does not turn on them, we leave for another day the questions of how and when § 2254(e)(1) applies in

challenges to a state court's factual determinations under § 2254(d)(2)."); *Murray v. Schriro*, 745 F.3d at 1001 ("[W]e do not believe the difference between our two lines of cases is determinative in this case, and thus we need not resolve the apparent conflict to decide this case.").

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to, or an unreasonable application of Supreme Court precedent or by establishing that the state court's factual findings were unreasonable—then the federal habeas court must review the petitioner's claim de novo.[1] *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014).

When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court as well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167-68. Contrarily, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d at 1000.

---

[1]     De novo review is also required where the state appellate court did not decide a properly-asserted claim or where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

Even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U. S. 432, 436 (1995) (internal quotation marks omitted).

## DISCUSSION

### 1.     Petitioner Is Not Entitled to Relief on Claim A

Claim A asserts speedy trial violations under both state and federal law.

### A.     *Claim A(i): State Law Speedy Trial Right*

Claim A(i)—which relies on Idaho state law—is not cognizable in this federal habeas action. As explained in its previous Order reopening this case (Dkt. 10 at 3), violations of state law are not cognizable on federal habeas review. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Thus, Petitioner is not entitled to relief on this claim.

### B.     *Claim A(ii): Sixth Amendment Speedy Trial Right*

Claim A(ii) asserts a violation of Petitioner's right to a speedy trial under the United States Constitution.

#### i.     Clearly-Established Law

The Sixth Amendment guarantees every defendant the right to a speedy trial. The

Supreme Court has described the right as "generically different from any of the other rights enshrined in the Constitution for the protection of the accused." *Barker v. Wingo*, 407 U.S. 514, 519 (1972). The speedy trial right exists to safeguard the rights of the defendant, but there is also "a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Id*. The right is "necessarily relative, . . . consistent with delays[,] and depends upon circumstances." *Id*. at 522 (internal quotation marks omitted).

The "amorphous" right to a speedy trial is not subject to rigid analysis, but, rather, must be considered by applying a balancing test. *Id*. at 522, 530. A court must consider four factors in considering whether a habeas petitioner has established a speedy trial violation: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) prejudice to the defendant. *Id*. at 530-32. These factors are related "and must be considered together with such other circumstances as may be relevant." *Id*. at 533.

The fourth factor, prejudice to the defendant, "must be considered in the light of the interests the speedy trial right was designed to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *United States v. MacDonald*, 435 U.S. 850, 858 (1978) (quoting *Barker*, 407 U.S. at 532). The limitation on the defendant's ability to mount a defense is the "most serious," because it "'skews the fairness of the entire system.'" *Id*. at 858 (quoting *Barker*, 407 U.S. at 532).

ii.    The Decision of the Idaho Court of Appeals

The charges against Petitioner were filed on January 27, 2004. (State's Lodging A-1 at 60-61.) On July 16, 2004, four days before trial was initially set to begin, the prosecution moved for a continuance, "assert[ing] that several witnesses were military personnel assigned to temporary duty (TDY) outside the state and were unavailable for trial." (*Id*. at 63, 66; State's Lodging C-9 at 2.) Petitioner objected. After a hearing, and after considering the *Barker* factors set forth above, the trial court granted the motion to continue and reset the trial for January 4, 2005. (State's Lodging A-7 at 1-32.)

The Idaho Court of Appeals affirmed, concluding that the *Barker* factors weighed against finding a speedy trial violation. As to the first factor, the court found that the length of delay was not unreasonable:

> As Ciccone points out, when his trial began on January 4, 2005, it was nearly twelve months from when the information was filed. This delay is not as significant, given that the nature of the charges Ciccone was facing—two counts of first degree murder—can be fairly characterized as complex. *Compare [State v.] Davis*, [141 Idaho 828, 837, 118 P.3d 160, 169 (Ct. App. 2005)] (concluding that a DUI charge arising out of a traffic stop could not be characterized as complex), and *State v. Moore*, 148 Idaho 887, 902, 231 P.3d 532, 547 (Ct. App. 2010) (same), with *[State v.] Lopez*, [144 Idaho 349, 353, 160 P.3d 1284, 1288 (Ct. App. 2007)] (concluding a seventeen-month delay was unreasonable because "the record on appeal shows no difficulty with complexity of investigation, lost witnesses, trouble marshalling evidence, or any other mitigating circumstance justifying the delay"). Here, the severe nature of the alleged offenses required more time than that of a non-complex case. In addition, witnesses were unavailable, the defense did not provide an expert's curriculum vitae until after the State requested a continuance, and the Air Force procedures and

protocol provided complications that all added to the length
of the delay.

(State's Lodging C-9 at 9.)

As for the second *Barker* factor, the reason for the delay, the court of appeals held

that the unavailability of witnesses, as well as the fact that a branch of the military was

also investigating the case, weighed against a finding of a speedy trial violation:

> Ciccone argues that the State has not demonstrated that
> the witnesses were truly unavailable. A witness being
> unavailable for trial due to active military service is a good
> reason for delay. *See, e.g., Bell v. State*, 287 Ga. App. 300,
> 651 S.E.2d 218, 219–20 (2007) (reason for the delay was
> sufficient when witness was unavailable because she was on
> active duty as a member of the armed forces and was serving
> in Iraq); *People v. Chardon*, 83 A.D. 3d 954, 922 N.Y.S. 2d
> 127, 128–29 (2011) (holding that a "subsequent period
> between June 8, 2005, and July 7, 2005, were attributable to
> exceptional circumstances and, therefore, excludable [ ], since
> the complainant was deployed for military service in Korea");
> *Commonwealth v. Hyland*, 875 A.2d 1175, 1190–92 (Pa.
> Super. Ct.2005) ("The Commonwealth cannot be held to be
> acting without due diligence when a witness becomes
> unavailable due to circumstances beyond its control.
> Certainly, [a witness's] deployment to the Middle East was a
> matter over which the Commonwealth had no control.");
> *Kelley v. Commonwealth*, 17 Va. App. 540, 439 S.E.2d 616,
> 619 (1994) ("the Commonwealth was justified in requesting a
> continuance for the period in which [ ], their primary witness,
> was called to military duty in the Persian Gulf").

> Ciccone also argues that the State negligently waited
> for the Air Force to conclude its investigation, which caused
> the subpoenas to be sent in June. The Air Force investigation
> contained a witness list that the State used to prepare for trial.
> All of the witnesses in the report were Air Force members.
> Although waiting for the conclusion of the investigation
> pushed the State to the discovery deadline, the list was given
> to defense counsel before the deadline date. The State waiting

for the conclusion of the Air Force investigation was
reasonable, given the unique circumstances of the military
community and military procedures.

(*Id*. at 8 (alterations in original).)

The court found that the third factor weighed in favor of finding a speedy trial
violation because Petitioner asserted his speedy trial right in response to the prosecution's
motion to continue. (*Id*. at 9.)

With respect to the prejudice factor, the Idaho Court of Appeals considered the
three interests protected by the Speedy Trial Clause—oppressive pretrial incarceration,
reduction of anxiety and concern, and the potential to impair presentation of a defense,
*see Barker*, 407 U.S. at 532—and determined that the prejudice suffered by Petitioner did
not justify finding a violation of that Clause. "As for the first two interests," the court
found that Petitioner "endured anxiety while he was facing charges from the State and
remained incarcerated for the entirety of the time between his arrest and trial." (State's
Lodging C-9 at 10.)

With respect to the impairment-of-the-defense factor, Petitioner relied that the
potential of witness memory loss hampered his ability to defend himself:

Ciccone specifically argues that one witness, Ms. Shaw,
testified at trial that when Ciccone got out of his car and
started talking on his cell phone, he said "I got the job done."
When confronted with the fact that she had never revealed
this information before, Shaw said that no one had ever asked
her what Ciccone had said into his cell phone. However,
Shaw had been asked that question before at Ciccone's
preliminary hearing and had testified then to not being able to
hear what Ciccone had said into his cell phone. Ciccone
attributes that misstatement to the extended delay in bringing

him to trial. Ciccone contends that one witness's memory "could have deteriorated so significantly by the time of Mr. Ciccone's trial, one must wonder how reliable any of the witness' (sic) trial testimony was so long after the fact."

(*Id*. (alteration in original).) The court of appeals concluded, however, that Petitioner's assertion of prejudice was speculative and unavailing:

> First, the witness that misstated her previous testimony was cross-examined and impeached by Ciccone's attorney. Furthermore, Ciccone's attorney made specific reference to the inconsistent statements during closing argument. The impeachment removed any prejudice Ciccone could have faced by the witness's inconsistent testimony. Second, Ciccone's argument is based solely on speculation and does not demonstrate prejudice. *See [United States v. Loud Hawk]*, 474 U.S. [302,] 315 [(1986)] (alleging only a "possibility of prejudice is not sufficient to support" a claim of a speedy trial violation).

(*Id*. at 10-11.) Therefore, the court held, Petitioner "failed to demonstrate that the delay prejudiced his defense to the charges in any degree." (*Id*. at 11.) Considering the four *Barker* factors together, the court of appeals concluded that the delay in bringing Petitioner to trial did not violate the Speedy Trial Clause.

### iii.    The State Court's Decision on Claim A(ii) Was Not Unreasonable

In considering Petitioner's speedy trial claim, the Idaho Court of Appeals appropriately identified and applied *Barker* as setting forth the controlling analysis. (*Id*. at 3, 5, 7, 8-11.) That court's conclusion that the length of the delay was not unreasonable given the charges against Petitioner is supported by *Barker*'s statement that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex, conspiracy charge." *Barker*, 407 U.S. at 531. No clearly-established Supreme

Court precedent suggests that a year-long delay in a case where the defendant is accused of murdering his wife and unborn child is unreasonably long.

Further, that the military witnesses were unavailable at the time initially set for trial was a justifiable reason for the delay. *See id.* at 534 (stating that the illness of a witness was "a strong excuse" for seven months of delay in that case). Petitioner argues that most of these witnesses did not end up testifying and that, therefore, the prosecution must have requested the continuance simply "to benefit from further pre-trial publicity." (Dkt. 20 at 10.) This contention is irrelevant and unsupported. That the prosecutor eventually determined, presumably as a matter of trial strategy, not to use all of State's potential witnesses does not suggest a nefarious motive. And because counsel cross-examined Darlene Shaw on her inconsistent statements (State's Lodging A-8 at 520-44), there is no evidence that the delay hampered Petitioner's ability to present his defense.

For these reasons, despite Petitioner's assertion of his constitutional speedy trial right, the Idaho Court of Appeals' decision that the other three *Barker* factors justified the delay was not contrary to or an unreasonable application of Supreme Court law, nor was it based on an unreasonable factual determination. *See* 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to relief on Claim A(ii).

**2.      Petitioner Is Not Entitled to Relief on Claim B**

In Claim B, Petitioner alleges that the prosecutor engaged in misconduct by twice commenting on Petitioner's failure to testify, in violation of the Fifth Amendment, and by

asking the jury to convict Petitioner based on sympathy for the victim, in violation of the Due Process Clause.

### A.    *Clearly-Established Law*

A prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger v. United States*, 295 U.S. 78, 88 (1935), although such methods will warrant habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" *Darden v. Wainwright*, 477 U.S. 168, 180 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A court must consider the record as a whole when making such a determination, because even a prosecutor's inappropriate or erroneous comments or conduct might not be sufficient to undermine the fairness of the proceedings when viewed in context. *See United States v. Young*, 470 U.S. 1, 16-17 (1985); *Darden*, 477 U.S. at 182 (applying *Young*); *see also DeChristoforo*, 416 F.3d at 647-48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process").

A prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury." *Darden*, 477 U.S. at 192 (internal quotation marks omitted). However, a prosecutor's closing argument, "billed in advance to the jury as a matter of opinion not of evidence," is "seldom carefully constructed" and may contain "[i]solated passages" that are "less than crystal clear." *DeChristoforo*, 416 U.S. at 646-47. Therefore, a court must not "lightly infer that a prosecutor intends an ambiguous remark to have its

most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647.

When reviewing prosecutorial misconduct claims under the unreasonable application prong of § 2254(d)(1), a court must keep in mind that this standard is a "very general one" that affords courts "leeway in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam) (internal quotation marks and alterations omitted).

The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Every criminal defendant has a right not to testify, and the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 616 (1965).

Not every comment relating to the right not to testify violates the Fifth Amendment, however. The Fifth Amendment is "concerned only with *adverse* comment, whether by the prosecutor or the trial judge"; neutral comments, such as an instruction by the court that the jury may not infer guilt from a defendant's silence, do not offend the Constitution. *Lakeside v. Oregon*, 435 U.S. 333, 338 (1978). Moreover, a prosecutor's comments on a defendant's silence will not violate the Fifth Amendment if those comments constitute fair argument offered in response to a defense claim that the

defendant did not have a chance to tell his side of the story. *United States v. Robinson*, 485 U.S. 25, 31-32 (1988).

For example, in *Robinson*, the defendant did not testify at trial. During closing argument, defense counsel argued that the government had breached its "duty to be fair" and had not allowed the defendant to explain himself. *Id.* at 27 n.2. The prosecutor then told the jury, "[Defense counsel] has made comments to the extent the Government has not allowed the defendant[] an opportunity to explain. It is totally unacceptable. . . . He could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." *Id.* at 28. The Supreme Court held that the prosecutor's statements, taken in the context in which they were made, did not violate the defendant's Fifth Amendment right to be free from compelled self-incrimination. *Id.* at 31. The Court determined that the Fifth Amendment does not "prohibit [a] prosecutor from fairly responding to an argument of the defendant by adverting to [the accused's] silence." *Id.* at 34; *see also Darden*, 477 U.S. at 179 (stating that, when a prosecutor's allegedly improper comments occur in a rebuttal closing, those comments "must be evaluated in light of the defense argument that preceded [them].").

### B.     *The Decision of the Idaho Court of Appeals*

Petitioner's defense at trial was that he accidentally hit his wife with his car. Though Petitioner did not testify at trial, he did make some statements to police when he was interviewed.

During closing argument, the prosecutor asserted that Petitioner and his wife had a serious argument in the car before her death, that she had gotten out of the car, that Petitioner had become very angry, that the victim had walked away, and that Petitioner later purposely ran her down. The prosecutor relied in part on various items in the road where the victim got out of the car:

> For whatever reason, along that dusty dirt road, something happened. An argument broke out. Something happened on K&R Ranch Road where food was thrown, medication was thrown, a purse was laid down, dropped, thrown, a bag of food was thrown. A sweater was laying in the middle of the road, one that [Petitioner] says [the victim] usually ties around her waist.
>
> And for some reason, [the victim] . . . decided to go back down Ditto Creek Road. She walked, and he had watched her. He said he watched her walking. She left in a huff. . . . [She] is now walking down a dirt road; left side, right side, middle, nobody knows.
>
> What we do know is that it takes time to walk there. What we do know is where she was right, right before Darlene Shaw's driveway. What we do know is that Albert Ciccone drove his Dodge neon SRT4, special edition turbo-charged car down that road.
>
> . . . .
>
> He hit her with enough force to throw that body 75 feet in the air, across the driveway . . . , flying across the air, like she was going on a water slide.

(State's Lodging A-8 at 1771-72.) Later, the prosecutor returned to the argument on K&R Ranch Road:

> There is twenty minutes out there that something happens. There is twenty minutes of an argument. Well, let's not say it

> is an argument. Let's not say it's a tiff. Let's not say she was
> pissy. Let's call a spade a spade. When you are throwing
> food, you're throwing bottles, clothes are getting taken off,
> purses are being left behind—if you're mad enough to be
> throwing food, that's not a tiff; that's a full-blown fight.

(*Id.* at 1780-81.)

During the defense's closing argument, Petitioner's counsel intimated that

Petitioner did not seriously argue with his wife prior to her death, relying in part on

Petitioner's statements to police. Counsel questioned the relevance of the purse, food, and

other items on K&R Ranch Road, implying that Petitioner had not thrown the items;

according to Petitioner, they had been in his wife's possession when she got out of the

car:

> Now, we have seen from the evidence on the K&R
> Ranch Road that we have French fries, we had cigarettes, we
> had Icee, we had a sweater, we had a purse, we had track
> marks all on the K&R Ranch Road.
>
> [Petitioner] stated in the interview [that the victim] had
> the food on her side. The purse was found in the middle of the
> road. But think about it. A woman's purse. That's a sacred
> thing. The State seems to imply that [Petitioner] was throwing
> the purse. [Petitioner] was throwing the medicine. [Petitioner]
> was throwing the food. That's totally inconsistent with our
> day-to-day norm. It is totally inconsistent with the evidence.
>
> They don't dispute the fact that the bag, the Burger
> King, and the Icee was in [the victim's] possession. How
> many women do we know that will reach in a car that she is a
> passenger [in and put the purse somewhere where [Petitioner]
> could][2] throw it at her? That simply does not make sense.

---

2       This bracketed phrase is barely legible in the copy of the transcript lodged by Respondents.
However, what the Court can discern of this phrase is consistent with Respondents' quotation of it, and
Petitioner has not objected to that quotation. (*See* Dkt. 14 at 19.)

> So you have got a purse. You have got food. You have
> got a tiff, you've got a huff, however you want to classify it.
> The accident scene.

(*Id.* at 1833-84.) This argument appears to have been based primarily on Petitioner's

statement to Detective Catherine Wolfe that Petitioner's wife—not Petitioner—had

thrown her purse, the food, and the other items on the road. (*See* State's Lodging A-8 at

1564.) In this manner, counsel attempted to downplay the seriousness of the

disagreement, or to downplay Petitioner's participation in it, and to reinforce the accident

theory.

In rebuttal closing, the prosecutor responded to defense counsel's remarks, arguing

that there was no way to know exactly what happened on K&R Ranch Road that night,

including how the purse and other items ended up in the road, and that Petitioner's

statements to police did not, in fact, support his claim that he accidentally killed his wife

and child:

> Let's talk about [Petitioner's counsel] talking about the
> scene on K & R Ranch Road. How this precious purse a
> woman would have carried, the bag of food she obviously had
> in her possession because that's what [Petitioner] said.
>
> So I guess she has got the purse in the car, the bag of
> food in the car, the medicine, the sweater tied around her and
> everything. And she decided to get out with all of that stuff on
> K & R Ranch Road . . . and decided to walk however many
> feet . . . walk up there with all the purse, sweatshirt tied
> around her waist, bottle of pills, and all the food bag, and had
> enough wherewithal to throw it all at him right- or left-
> handed. Maybe she put the purse down to get the McDonalds
> bag or Burger King to throw at him. Maybe she just left it
> there. I don't know. *There's only two people that know, and
> [the victim] isn't here to tell us.*

Did the defendant try and hide this evidence, as the defense has talked to [Detective] Cathy Wolfe about? He knew she was going to find it. Well, he sure as heck didn't walk back towards the driveway after he had run down his wife. As a matter of fact, they found him about as far away as you could get in that time frame from the driveway.

Did he ever tell Cathy Wolfe, "I didn't turn around here [where Detective Wolfe had falsely told Petitioner he made a J-turn, *see* State's Lodging A-8 at 1545]. You're wrong. I turned around at K & R Ranch Road. That's where we got to. That's where we stopped. That's where we had a fight. That's where I turned around"?

He never once said, at least in my memory, that that's where he turned around. He bought on [to the detective's false statement and said], "Oh, this is where I turned around. Why would I turn around here? It doesn't make sense. We just had a little tiff. We were just joking. She wanted to go see her friends. That was it."

He didn't say, "Detective Wolfe, it has come back to me now. I turned around up here."

As a matter of fact, he didn't even mention throwing the food or anything else until Cathy Wolfe said, "Look, we found all the food." Oh, well, excuse me. I had a bad day. Pardon me for my omission.

This wasn't a guy cooperating. Remember what Cathy Wolf said. When you cooperate with somebody, it is not just answering questions; it is answering questions truthfully. If you are making stuff up, you are not cooperating.

(State's Lodging A-8 at 1853-55 (emphasis added).)

Petitioner claims that the prosecutor's statement, "There's only two people that know [what happened], and [the victim] isn't here to tell us," was an improper comment on Petitioner's right not to testify. As the state appellate court explained, "[a]ccording to

[Petitioner], the prosecutor's statement implied that Petitioner was invoking his right to silence because only he could have told the jury about his argument with the victim." (State's Lodging C-9 at 12.)

The Idaho Court of Appeals rejected this claim, holding that the prosecutor's comment "did not infringe on [Petitioner's] right to silence" but, instead, "was made in response to defense counsel's reference to [Petitioner's] interview with the police":

> At that interview, Ciccone discussed the purported evidence and claimed that he accidently hit his wife with the car. Rather than making the improper implication as Ciccone alleges, the prosecutor merely explained Ciccone's prior statement to the police. This result is further evidenced by the prosecutor's remarks "that's what [Petitioner] said" and "[d]id he ever tell Cathy Wolfe." Considering the entirety of the argument, the prosecutor's statement was not improper and, therefore, did not rise to the level of fundamental error.

(*Id*. at 13-14.)[3] The court held that the comment was not aimed at Petitioner's choice not to testify, but rather was merely "a reference to a custodial interview." (*Id*. at 14.)

Also in rebuttal closing, the prosecutor stated, "How do you miss a person walking down that road? There is nothing in any of these photographs to suggest that he missed her, unless you want to hit her." (State's Lodging A-8 at 1855-56.) The prosecutor continued:

> There is no testimony that [Petitioner] was looking down at is [sic] watch, that the cigarette smoke had blown in

---

[3]    The court of appeals used the "fundamental error" standard because Petitioner did not object to the prosecutor's comment at trial. This doctrine of Idaho law requires reversal, even without a contemporaneous objection, if the alleged trial error "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *State v. Perry*, 245 P.3d 961, 980 (Idaho 2010).

his face, that he was changing the radio station, that a cassette
dropped, a cigarette dropped in his pants, he had to try and
put it out real quick. No testimony as to that. Absolutely
none. He doesn't say anything about any—

(*Id.* at 1856.) At this point, defense counsel objected, and the trial court sustained the

objection after a sidebar. (*Id.*)

After the prosecutor finished the rebuttal closing—about four pages of the

transcript later—the trial court gave a curative instruction to the jury:

> Ladies and gentlemen of the jury, the jury will
> disregard any argument based upon what the defendant did
> not say. As stated earlier in instruction 55, a defendant in a
> criminal trial has a constitutional right not to be compelled to
> testify.
>
> The decision of whether to testify is left to the
> defendant acting with the advice and assistance of the
> defendant's lawyer. You must not draw any inference of guilt
> from the fact the defendant did not testify, nor should this fact
> be discussed by you or enter into your deliberations in any
> way.

(*Id.* at 1860-61.)

The Idaho Court of Appeals first recognized Petitioner's appellate counsel's

concession that the claim as to this second statement was not "an individual claim of

error because a defense objection was sustained and trial counsel failed to move for a

mistrial." (State's Lodging C-9 at 14.) The court then addressed Petitioner's argument

that the second statement nonetheless "contributed to the 'general tone' that [Petitioner]

failed to testify." (*Id.*) The state court rejected that argument because (1) the second

statement "was objected to and the objection was sustained, stopping any further

improper comments," and (2) "a curative instruction was given to the jury to ensure that no weight was given to [Petitioner] invoking his right to silence." (*Id.*)

The third challenged statement made by the prosecutor during rebuttal closing was the following, which Petitioner argues was improperly intended to obtain a conviction based on sympathy for the victim:

> *When you kill somebody, you take away everything they have and everything they ever will have. [The victim] was twenty-two years old. Her death is a tragedy. Give her life meaning and give her death the sense of justice that it requires.* Hold the defendant accountable for the purposeful, willful, deliberate, premeditated actions that he took that night.

(State's Lodging A-8 at 1860 (emphasis added).)

Reviewing for fundamental error because of the lack of a contemporaneous objection, the court of appeals rejected Petitioner's challenge to this comment:

> Even if we assume that the prosecutor's statement strayed into the realm of emotional appeal, it did not approach the level of egregiousness necessary to constitute fundamental error. Prior to making the statement cited above, the prosecutor said, "[t]his case is about [the victim's] death, not the mother's pains, not about . . . Ciccone's being in the hands of [defense counsel]. *It is about how and why she died.*" (Emphasis added.) Moreover, after the statement Ciccone alleges is improper, the prosecutor clearly ask[ed] the jury to "[h]old the defendant accountable for the purposeful, willful, deliberate, premeditated actions that he took that night." The prosecutor stated twice that Ciccone should be found guilty based on his criminal actions. We conclude this statement does not rise to the level of prosecutorial misconduct and thus Ciccone has failed to demonstrate fundamental error.

(State's Lodging C-9 at 15 (first and third alterations in original).)

### C.       The State Court's Decision on Claim B Was Not Unreasonable

It was reasonable for the Idaho Court of Appeals to determine that the first comment at issue—that only two people knew what happened and the victim could not tell the jury about it—was not an impermissible adverse reference to Petitioner's decision not to testify. In closing argument, defense counsel had relied on Petitioner's statements to police to suggest that the scene on K&R Ranch Road meant something other than what the prosecutor asserted. The prosecutor was allowed to fairly respond to the defense argument by referring back to what Petitioner told the police and by discussing the purse and other items in the road. *See Darden*, 477 U.S. at 179 (stating that a prosecutor's comments "must be evaluated in light of the defense argument that preceded [them]."). The state court's decision as to this first comment is not unreasonable under 28 U.S.C. § 2254(d).

As for the second challenged comment—noting the lack of testimony as to certain propositions—the objection to that comment was sustained, and the trial judge gave a curative instruction. Therefore, Petitioner cannot establish that he was prejudiced by the prosecutor's comment on the lack of testimony to support Petitioner's accident theory. *See Brecht*, 507 U.S. at 637.

Finally, it was not unreasonable for the court of appeals to determine that the prosecutor's third comment—asking the jury to give meaning to the victim's life and justice for her tragic death—was not so egregious as to constitute prosecutorial misconduct that deprived Petitioner of due process. *See DeChristoforo*, 416 U.S. at 646-

47. Thus, Claim B fails under 28 U.S.C. § 2254(d). As noted by the state court, the prosecutor emphasized that the *evidence* established Petitioner's guilt, and there is no reason for this Court to infer either that the prosecutor intended the comment "to have its most damaging meaning" or that the jury actually took that meaning "from the plethora of less damaging interpretations." *DeChristoforo*, 416 U.S. at 647.

Therefore, Claim B fails on the merits under § 2254(d).

## 3. Petitioner Is Not Entitled to Relief on Claim C

Claim C alleges that the trial court abused its discretion in imposing a fixed life sentence. Like Claim A(i), Claim C asserts a violation of state law. Because this state-law claim is not cognizable in this federal habeas action, Claim C must be dismissed. *See Lewis*, 497 U.S. at 780.

Further, to the extent Claim C can be construed as asserting that Petitioner's fixed life sentence violates the Cruel and Unusual Punishments Clause of the Eighth Amendment, the claim fails on the merits. The Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991). In applying this principle, the United States Supreme Court has reviewed several unquestionably harsh sentences and has not deemed any similar punishment cruel and unusual.

In *Harmelin*, the Supreme Court upheld a judgment sentencing the defendant to a statutory mandatory life sentence without the possibility of parole for possessing more than 650 grams of cocaine. *Id.* at 1002-04. In *Rummel v. Estelle*, it did not disturb a

sentence of life with the possibility of parole for a recidivist offender for the crimes of

fraudulent use of a credit card to obtain $80 in goods and services, passing a forged check

for $28.36, and obtaining $120.75 by false pretenses. 445 U.S. 263, 286 (1980). In

upholding the sentence, the Court cited, as an example of a disproportionate sentence, "if

a legislature made overtime parking a felony punishable by life imprisonment." *Id.* at 274

n.11.

In *Lockyer v. Andrade*, the Supreme Court held that two consecutive sentences of

25 years to life in prison for a "third strike" provision of state law for stealing $150 worth

of videotapes did not violate the gross disproportionality principle and did not warrant

habeas corpus relief. 538 U.S. 63, 66, 76 (2003). And in *Ewing v. California*, the Court

affirmed a life sentence where the defendant was convicted of felony grand theft for

stealing three golf clubs worth $399 each. 538 U.S. 11, 18, 20 (2003).

As can be seen from these cases, "[s]evere[] . . . penalties may be cruel, but they

are not unusual in the constitutional sense." *Harmelin*, 501 U.S. at 957 (1991). The Court

concludes that Petitioner's fixed life sentence for the first-degree murder of his wife does

not violate the Eighth Amendment. Thus, even if Claim C is construed as a federal claim,

Petitioner is not entitled to habeas relief on that claim.

### 4.     Petitioner Is Not Entitled to Relief on Claim D

In Claim D, Petitioner claims that, by requiring him to file his appellate brief

before his appellate counsel had received all of the transcripts in the case, the Idaho

Supreme Court violated his right to due process. The Court noted in its previous Order that this claim was subject to summary dismissal:

> Petitioner's claim that the Idaho Supreme Court violated his federal due process rights by requiring him to file his direct appeal brief before Petitioner received the transcript of the last day of trial fails to state a claim upon which relief can be granted: Petitioner has asserted no harm or prejudice that resulted from the Idaho Supreme Court's imposition of the early deadline. Petitioner does not assert that he later discovered a meritorious claim in the transcript, [or] that he attempted to amend or supplement his appellate brief, but was denied the opportunity to do so.

(Dkt. 10 at 3.) Though the Court informed Petitioner that he could file a second amended petition to reassert Claim D, with additional factual support, he did not do so. (*Id*.)

Therefore, for the reasons stated in the Order Re-Opening Case (Dkt. 10), Claim D fails on the merits under de novo review.

**5.      Petitioner Is Not Entitled to Relief on Claim E**

Claim E alleges that Petitioner's trial counsel rendered ineffective assistance at sentencing by failing to present mitigating evidence in the form of a psychological evaluation performed by Dr. Craig Beaver—an evaluation that led Dr. Beaver to conclude that Petitioner had serious mental health issues. Petitioner contends that his attorney acted on the basis of mistakes of fact and law, and, therefore, the decision not to present this evidence was not a reasonable tactical decision. Petitioner also alleges that he has shown prejudice because there is a reasonable possibility that the trial court would not have sentenced him to a fixed life term if the court had notice of Petitioner's mental illness.

## A.    Clearly-Established Law

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The standard for ineffective assistance claims was identified in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel case. *Id.* at 697. On habeas review, a federal court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must

indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which witnesses or other evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. Further, counsel is not deficient in an area where an investigation would not have been fruitful for the defense.

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether the state court reasonably applied *Strickland*. *See Duhaime*, 200

F.3d at 600. First, tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Third, "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017); *see also id.* ("Weeden's counsel could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal.").

If a petitioner shows that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected

> by errors than one with overwhelming record support. Taking
> the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86 at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an
> incorrect application of federal law." *Williams*, *supra*, at 410,
> 120 S. Ct. 1495. A state court must be granted a deference
> and latitude that are not in operation when the case involves
> review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

That is, when evaluating a claim of ineffective assistance of counsel in a federal habeas proceeding under § 2254(d), the Court's review of that claim must be "doubly deferential." *Pinholster*, 563 U.S. at 190 (internal quotation marks omitted).

### B.     Decision of the Idaho Court of Appeals

Dr. Craig Beaver conducted a neuropsychological evaluation of Petitioner in preparation for sentencing, as stipulated between the parties. (State's Lodging E-4 at 1-2.) Dr. Beaver provided Petitioner's trial counsel with a verbal evaluation but, at counsel's direction, Dr. Beaver did not prepare a written report. (State's Lodging D-2 at 57-59.)

At the evidentiary hearing during Petitioner's successive post-conviction proceedings, trial counsel testified that he had spoken with Dr. Beaver after the evaluation, took notes regarding that conversation, and did additional research on what he learned from Dr. Beaver. (*Id.* at 57-58.) According to trial counsel's notes from the phone call, Dr. Beaver determined that Petitioner suffered from major depression and borderline personality disorder. (*Id.* at 63.) Dr. Beaver compared Petitioner to counsel's first wife— with whom Dr. Beaver was familiar—saying, "[Petitioner's] just like your first wife, remember?" Hearing this, defense counsel wrote down the phrase, "controlling and abusive," in his notes; counsel testified that his wife was a borderline personality as well and that this diagnosis by Dr. Beaver "hit home." (*Id.*) Dr. Beaver also told trial counsel that Petitioner "was in deep denial of his culpability." (*Id.*)

It was counsel's practice to get this type of verbal report first, and then to determine whether to direct the expert to prepare a written report. Counsel's reasoning was that, if the information was detrimental to the client, he would not want to have anything in writing to that effect. (*Id.* at 77-78.) Therefore, counsel considered whether to request that Dr. Beaver write a report for presentation at sentencing, but ultimately

concluded that "it was not in the client's best interest." (State's Lodging D-2 at 59.)
Petitioner's attorney was afraid that, if he had Dr. Beaver prepare a written report for
purposes of sentencing, then the prosecution could have had Petitioner evaluated by its
own expert—a doctor whom counsel called "Dr. Death," because "nothing he said as a
psychologist or mental doctor" tended to assist criminal defendants "in any way." (*Id.* at
65.)

Prior to sentencing, the trial court questioned Petitioner's attorney as to why there
was no psychological report in the sentencing materials. Counsel responded, "Judge, an
evaluation was conducted. But after due consideration and conference with the evaluator
and my client, it was elected not to have the report prepared for sentencing." (State's
Lodging A-8 at 1881.)

Dr. Beaver prepared an affidavit in support of Petitioner's successive post-
conviction petition. The affidavit stated that, if Dr. Beaver had prepared a written report,
the report would have stated that Petitioner (1) suffered from a "markedly elevated
profile indicating significant emotional and/or psychiatric issues"; (2) had "significant
mood instability"; (3) had a significant family history of bipolar disorders; and (4) had a
"significant mental-health component related to" the death of his wife and unborn child.
(State's Lodging E-4 at 3-4.) Dr. Beaver opined that such a report "may very well have
led the Court to a sentence other than fixed life." (*Id.* at 4.)

On appeal from the dismissal of Petitioner's successive post-conviction petition,
Petitioner argued that trial counsel's decision not to introduce evidence of Dr. Beaver's

evaluation was based on a mistake of fact—"that a diagnosis of borderline personality disorder meant [Petitioner] is controlling and abusive." (State's Lodging E-2 at 4.) The Idaho Court of Appeals rejected this argument, relying on the fact that, "although trial counsel noted the traits 'controlling and abusive' as related to his wife with a similar borderline personality diagnosis, counsel also conducted his own independent research of the diagnosis." (*Id*. at 4-5.) The appellate court found also that "counsel was also persuaded [not to submit the psychological evidence at sentencing] by the psychologist's opinion that [Petitioner] was in deep denial of his culpability." (*Id*. at 5.) Therefore, the court held, trial counsel made an objectively reasonable strategic decision that "a written psychological evaluation would negatively impact [Petitioner's] sentencing." (*Id*.)

Petitioner also asserted that trial counsel's decision about the psychological evidence constituted deficient performance because Dr. Beaver would not have necessarily had to include a diagnosis of borderline personality in any written report, so counsel's fear that the diagnosis could hurt Petitioner's chances at sentencing was unfounded. The state court of appeals disagreed, finding that trial counsel was "not deficient on this issue" because—even if "trial counsel could have ethically requested the psychologist to omit the specific diagnosis"—there was no evidence that Dr. Beaver would have done so upon counsel's request. (*Id*.)

Petitioner also contended that counsel was mistaken in believing that submitting a written psychological report would allow the prosecution to conduct its own evaluation using its own expert. The court of appeals rejected this claim as well, concluding that

using a psychological report in sentencing would have placed Petitioner's mental condition at issue, thereby "allowing the State's expert to have access not only to the report compiled by [Petitioner's] expert, but also to [Petitioner] himself in order to rebut [Petitioner's] attestations regarding his mental condition." (*Id*. at 7.) The court relied on the Supreme Court's decision in *Buchanan v. Kentucky*, 483 U.S. 402, 422-23 (1987), which held that, if a defendant places his mental condition at issue, the prosecution is entitled to rebut that evidence, at the very least, by referring to the defense expert's report. (*See id*. at 6-7.) Thus, the court concluded that Petitioner's trial counsel did not perform deficiently in choosing not to submit a written psychological report at sentencing for purposes of mitigation.

Finally, the state court of appeals determined that, even if counsel had performed deficiently, Petitioner could not show prejudice because the sentencing court was already aware of Petitioner's mental health issues:

> The sentencing judge acknowledged Ciccone's mental health issues after reviewing the presentence investigation report (PSI), which included evidence of Ciccone's mental health history, current mental status and family history of severe mental illness. Notably, the PSI included Ciccone's medical records from the hospital where he had been institutionalized for a failed suicide attempt just prior to the homicide. Additionally, the judge reviewed numerous victim impact letters that attested to Ciccone's family history of mental illness. Thus, it is unreasonable to assume that a psychological report providing similar information that was already available to the sentencing court would have changed the court's sentencing determination.

(State's Lodging E-4 at 8 (internal citation omitted).)

### C.     The State Court's Decision on Claim E Was Not Unreasonable

The Idaho Court of Appeals' determination on Claim E—that trial counsel made a reasonable strategic decision not to submit a written psychological report—was reasonable under 28 U.S.C. § 2254(d). As for counsel's purported belief that being a borderline personality disorder also meant (based on counsel's personal experience) being controlling and abusive, the state court reasonably found that Petitioner's counsel did not simply stop investigating at Dr. Beaver's comparison of Petitioner to counsel's ex-wife, but also conducted his own research into the disorder. This supports the state court's conclusion that counsel did not perform deficiently, because counsel's reasonable investigation appropriately governed the development of his sentencing strategy. *See Weeden*, 854 F.3d at 1070.

The court of appeals also reasonably concluded that counsel's performance was adequate with respect to his belief that a borderline personality diagnosis in a written report would create the potential for the State's expert to examine Petitioner. Because placing a defendant's mental health at issue opens the door to rebuttal evidence by the prosecution, it was objectively reasonable for counsel to choose to avoid that potential pitfall. *See Buchanan*, 483 U.S. at 422-23; *Kansas v. Cheever*, 134 S. Ct. 596, 601 (2013) ("[W]here a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal.").

The double deference that applies when reviewing ineffective assistance claims in habeas proceedings leaves no room for this Court to second-guess the tactical decision of Petitioner's counsel with the benefit of hindsight. *Pinholster*, 131 S. Ct. at 1403; *Strickland*, 466 U.S. at 689. Thus, Petitioner has not shown that the Idaho Court of Appeals unreasonably concluded that Petitioner's trial counsel performed adequately.

The state appellate court also reasonably concluded that Petitioner was not prejudiced by counsel's decision not to submit a psychological report at sentencing. As noted by the Idaho district court, counsel's decision as to the psychological evidence "did not change the outcome of the sentence, and in fact, presented a more favorable defense for the [Petitioner] without the risk of a countervailing report by a psychologist for the State." (State's Lodging E-4 at 8.)

Therefore, Petitioner is not entitled to relief on Claim E.

## CONCLUSION

For the reasons set forth above, the Court will deny Petitioner's Amended Petition for Writ of Habeas Corpus.

## ORDER

**IT IS ORDERED:**

1.      Respondents' Motion for Extension of Time (Dkt. 12) is GRANTED.

2.      Petitioner's Motion for Extension of Time (Dkt. 18) is GRANTED.

3.      The Amended Petition for Writ of Habeas Corpus (Dkt. 9) is DENIED, and this entire action is DISMISSED with prejudice.

4.      The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner wishes to appeal, he must file a timely notice of appeal with the Clerk of Court. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: **September 29, 2017**



_____
Honorable Candy W. Dale
United States Magistrate Judge